**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No. 26-cv-10040-MARTINEZ
Case No. 26-cv-10159-MARTINEZ

NICOLE SOHN, LINDA BAGLEY-SOHN,
and BAGLEY-SOHN TRUST 04/23/2021,

*Plaintiffs*,

v.

CITY OF KEY WEST,

*Defendant*.

_______________________________________/

NICOLE SOHN and LINDA BAGLEY-SOHN,

*Plaintiffs*,

v.

CITY OF KEY WEST,

*Defendant*.

_______________________________________/

**AMENDED CONSOLIDATED COMPLAINT**[1]

1. For many years, Key West has been known as a welcoming and inclusive community for all individuals, and particularly so for the LGBTQ+ community. To celebrate this fact, over a decade ago the City of Key West installed rainbow crosswalks at an intersection along iconic Duval Street.

2. But last year Governor Ron DeSantis's administration mandated that all localities statewide remove colorful markings and artwork on crosswalks and sidewalks. Acceding to that demand, the City of Key West painted over its rainbow crosswalks under cover of darkness.

3. To protest the crosswalks' removal, Plaintiffs Nicole "Coley" Sohn and Linda Bagley-Sohn painted twelve of the pickets on their home's picket fence in rainbow colors. Inspired by Plaintiffs, many other Key West residents also painted their picket fences in rainbow colors to join the protest.

4. The City then censored Plaintiffs' colorful and peaceful protest by selectively

[1] Plaintiffs file this amended consolidated complaint at the Court's direction. *See* Case No. 26-cv-10040, ECF No. 25; Case No. 26-cv-10159, ECF No. 6.

enforcing its ordinance code against them, based on the content and viewpoint of their expression.

5. The government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional . . . ." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

6. The City's selective enforcement of its ordinances against Plaintiffs' picket protest constitutes a content- and viewpoint-based restriction of Plaintiffs' constitutionally protected free expression. Plaintiffs bring this suit to vindicate their First Amendment rights and reaffirm Key West as the inclusive and neighborly place they know it to be.

* * *

7. Plaintiffs exercised their First Amendment right to sue the City of Key West for selectively enforcing its municipal code against them in a discriminatory manner. In response, the City took the comparator evidence Plaintiffs presented in that lawsuit, opened code enforcement cases against those properties, and falsely informed Plaintiffs' neighbors that the cases were opened because Plaintiffs submitted code violation complaints to the City.

8. In doing so, the City exposed Plaintiffs to reputational harm, instigated friction with their neighbors, and sent a chilling message to all who might challenge the City's selective enforcement, announcing: *if you sue us, we will punish your community and falsely identify you as a code-complaining snitch*. The First Amendment forbids the City from exacting such a price for seeking redress in court.

9. Nor does the First Amendment permit what the City did next. Plaintiffs demanded the City stop misrepresenting them as having submitted code violation complaints. Rather than accede to the truth, the City scoffed at Plaintiffs' demand and responded that it would continue falsely identifying Plaintiffs as the complainants unless and until they withdraw the factual allegations supporting their pending constitutional claim.

10. The City thus attempted to force Plaintiffs to choose between presenting evidence needed to support their pending lawsuit and protecting their relationships and reputation in their community.

11. Plaintiffs reject the City's unlawful ultimatum. They once again bring suit to vindicate their rights under the First Amendment.

## I. PARTIES, JURISDICTION, AND VENUE

12. Plaintiffs Nicole "Coley" Sohn and Linda Bagley-Sohn own a house in Key West's Historic District, where they live.

13. Plaintiff Bagley-Sohn Trust 04/23/2021 is a trust that holds title to Ms. Sohn and Ms. Bagley-Sohn's house. Ms. Sohn and Ms. Bagley-Sohn are the trustees.

14. Defendant City of Key West is a Florida municipality.

15. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343, as well as 42 U.S.C. §§ 1983 and 1988, because this action arises under the Constitution and laws of the United States.

16. Venue is proper in this District under 28 U.S.C. § 1391(b) because the defendant resides here and a substantial part of the events giving raise to the claim occurred here.

## II. FACTUAL ALLEGATIONS

### *1. Key West's Selective Enforcement*

#### A. Key West's Historic District Regulations

17. Key West's Historic District encompasses about 800 acres in the City's Old Town, including Plaintiffs' home.

18. The City's Ordinance Code provides that, in general, structures (including fences) in the Historic District must comply with design guidelines promulgated by the City's Historic Architectural Review Commission (HARC).

19. The HARC Guidelines provide that white is the only appropriate color for wood fences and gates.[2]

20. HARC must approve the design and construction of new fences, as well as changes to existing fences. HARC has the authority to approve work that augments or preserves the Historic District's character and appearance, and likewise to *dis*approve work that does *not* augment or preserve the Historic District's character and appearance.

21. Erecting a new fence or changing an existing fence *without* HARC approval is a violation of the City's Land Development Regulations, punishable as a civil infraction.

#### B. Key West's Rainbow Crosswalks, Their Removal, and Plaintiffs' Protest

22. In 2015, the City of Key West installed rainbow crosswalks at the intersection of Duval and Petronia Streets, in the heart of Key West's Old Town.

---

[2] The Guidelines permit brighter "Caribbean" colors in the Bahama Village area, but Plaintiffs live outside that area.

23. The rainbow crosswalks were installed to celebrate Key West's LGBTQ+ community and Key West's tradition as an inclusive and welcoming place.

24. But last year, Governor DeSantis's administration mandated that all localities statewide remove colorful markings and artwork on crosswalks and sidewalks. By a 4–2 vote, the Key West City Commission voted to accede to the state's demands. Key West's rainbow crosswalks were painted over on the night of September 8 or 9, 2025.

25. To protest the City's removal of the rainbow crosswalks, later in September Plaintiffs painted in rainbow colors six of the pickets on the white picket fence in front of their house along Fleming Street, and six of the pickets on the side of their house along Frances Street:





26. Plaintiffs' rainbow picket display conveyed a particular message: a political protest against the removal of the rainbow crosswalks. Painting their pickets was itself a key component to communicating that message.

27. Plaintiffs' display inspired other Key West locals to similarly paint their own pickets in rainbow colors, joining in the protest and expressing community solidarity against the government's actions. More than 50 rainbow picket displays have been painted in the City's Historic District since the crosswalks' removal.

**C. The City's Selective Enforcement Against Plaintiffs' Display**

28. Plaintiffs' and their fellow protesters' displays prompted complaints from certain individuals who disapproved of the protest's message.

29. In particular, on December 19, 2025, Penny Walker Pourciau emailed the City to complain that Plaintiffs' display violated the HARC Guidelines. On information and belief, Ms. Walker Pourciau and her husband Jules Pourciau's social media pages include anti-gay posts.

30. The next day, December 20, 2025, a City code compliance officer left a "Good Neighbor Courtesy Notice" on Plaintiffs' fence gate, notifying them that the officer observed a code violation and requesting voluntary compliance.

31. The Courtesy Notice stated: "Please return picket fence to HARC approved color or contact HARC to apply for and obtain HARC approval for rainbow painted pickets."

32. On December 29, 2025, Plaintiffs took the City up on its offer to submit their rainbow display for HARC approval, applying for a permit as instructed by City staff.

33. On February 5, 2026, Plaintiffs received a "Notice of Code Violation" from the City, notifying them that their property was in violation of the code because the rainbow-painted pickets did not comply with the HARC Guidelines and therefore required HARC review and approval, and further informing them that the investigation began with Ms. Walker Pourciau's email complaint.

34. The Notice of Code Violation gave Plaintiffs 30 days to take corrective action or the matter would be referred for an administrative hearing.

35. The Notice further provided that failure to correct the violation may result in a fine of up to $250 per day.

36. On February 24, 2026, Plaintiffs again applied for HARC review of their display.

37. As of the filing of this suit, Plaintiffs received no notice of any action on their applications for HARC review and approval.

38. And on March 25, 2026, the code compliance officer informed Ms. Sohn that if the display was not removed by the next day, Plaintiffs would incur a $250 fee.

39. The next day, March 26, 2026, facing monetary sanction, Plaintiffs removed their rainbow display by painting their twelve pickets white.

40. Plaintiffs are not alone. The City has commenced code enforcement against most, if not all, of the 50+ rainbow picket displays in the Historic District. As a result of the City's enforcement, the vast majority of the rainbow displays have now been painted over.

**D. The City's Failure to Enforce the Regulations Against Other Violations**

41. While the City eagerly enforced its Historic District regulations against Plaintiffs' colorful protest, it chose *not* to cite noncompliant properties that express different messages.

42. Indeed, numerous fences and other exterior structures in the Historic District are out of compliance with the same HARC Guidelines cited against Plaintiffs, but these other

violations did not face enforcement prior to Plaintiff's lawsuit.

43. This non-compliance is as wide-ranging as it is well-known to the City; selective enforcement against rainbow pickets has been an ongoing topic of discussion, debate, and public comment at both City Commission and HARC meetings dating back to November 2025.

44. On February 9, 2026, one resident sent the Mayor and City Commissioners a public comment that was entered into the record and discussed during the February 11, 2026, City Commission meeting. In his comment, the resident exclaimed:

> [T]he City is ALREADY selectively enforcing HARC guidelines where rainbow pickets are involved . . . . [A] very brief walking tour of the historic district will reveal non-compliant yellow doors and shutters at 718 Southard; a blue entrance door at 806 Ashe (next to a Ceramic Star for Historic Preservation); pink shutters at 722 Ashe (also next to a Ceramic Star for Historic Preservation); an orange entrance door at 1024 Grinnell; and a purple entrance door at 1022 Catherine. In fact, one of our current HARC commissioners lists on her business website the work her firm did for the historic Coffee Mill. They proudly display photos of a RED fence, yellow trim, and blue shutters – all non-compliant in the historic district. The owner of 810 Georgia Street – the vocal proponent of slavish adherence to exclusively historic colors in the historic district – has non-compliant, purple shutters on his house in the Meadows. . . . [T]he[] fact that they exist in the historic district smacks of uneven administration of HARC rules.

45. During the February 11 City Commission meeting, recognizing that the City was selectively enforcing against rainbow pickets, one commissioner proposed pausing prosecutions while the City considered changing the HARC Guidelines. This pause was rejected by the City's attorney at the meeting, and the Commission took no action to cease selective enforcement.

46. Later that month, at HARC's February 24, 2026, meeting, one HARC commissioner admitted that his own iron railing violated the HARC Guidelines—but he had not been cited.

47. After calling the selective enforcement against rainbow-colored fences "Kafkaesque," the HARC commissioner derided the enforcement process: "We cherry pick what's suitable for certain situations. . . . We have not used the[] [HARC] Guidelines . . . as absolute, mandatory; we look at each situation as it comes along and make a decision."

48. Indeed, on information and belief, the *only* fence- and gate-color violations the City has cited in recent years prior to this suit have been Plaintiffs' and their co-protestors' rainbow

displays.

49. Below are a few of the non-white wooden fences and gates that, on information and belief, the City evidently chose *not* to cite, despite evidently also violating the HARC Guidelines:

































50. From left to right and top to bottom, these photographs show:

a. An artistic red picket with varicolored items affixed to it at 1113 Varela Street.

b. A blue gate at 908 Winsor Lane.

c. Another blue gate at 912 Winsor Lane.

d. Yet another blue gate at 719 Catherine Street.

e. Still another (grey-) blue gate at 801 Fleming Street.

f. A yellow peace sign (expressing a pro-peace message) and multicolored flowers painted on a gate at 317 Amelia Street.

g. A red picket fence and gate at 916 Pohalski Street.

h. A grey picket fence with a large red wooden heart built into it (expressing a message of love) at 724 Fleming Street.

i. Yellow and black pineapples (expressing a message of hospitality) painted on a gate at 827 Fleming Street.

j. Dark-colored pickets and gate at 320 Truman Avenue.

k. A dark green gate at 1121 Watson Street.

l. A pink picket fence at 1000 Eaton Street.

m. A teal picket gate at 715 Olivia Street.

n. A pink picket fence and gate at 902 Olivia Street.

51. Emphasizing how the City has selectively targeted Plaintiffs' and other similar rainbow-picket protests, the City cited a rainbow picket display that Plaintiffs themselves painted for the owner of 902 Olivia Street; the homeowner then removed the rainbow after being cited. But the City *chose not to cite* the nonconforming pink pickets at the very same property, as displayed in the photograph above.

52. The City's selective enforcement is indicated not just from these evidently nonconforming picket fences, but also from what, on information and belief, are other exterior violations (depicted below, from left to right and top to bottom):

a. Two roosters (a symbol of Key West) painted on a blue door at 723 Thomas Street. The HARC Guidelines provide that appropriate door colors are white, black, red, dark green, and natural finished wood.

b. A blue masonry wall, wrought-iron fence, and gates at 1211 Catherine Street. The HARC Guidelines provide that appropriate masonry wall colors are white, beige, and gray, and appropriate wrought-iron fence and gate colors are dark green and white.

c. A bright green masonry wall at 1019 Grinnell Street. The HARC Guidelines again provide that appropriate masonry wall colors are white, beige, and gray.

d. An unfinished cinderblock wall at 624 Ashe Street. The HARC Guidelines prohibit unfinished cinderblock walls.

e. A fence at 409 Frances Street that is over four feet tall and includes horizontal boards. The HARC Guidelines permit fences only up to four feet tall along property frontages, and prohibit non-vertical fencing.

f. A chain link fence at 813 Eaton Street. The HARC Guidelines prohibit chain link fencing.

g. A hand-painted sign asserting "not all who wander are lost" affixed to a picket fence at 910 United Street, right next to a rainbow display. The HARC Guidelines require HARC approval of all such signs; Page 1 of the Guidelines declares that signs "are a primary concern of the guidelines," and that "HARC approval MUST be secured on . . . [i]nstallation of signs[.]"


723


HUNTER HOUSE






ONE WAY




NOT ALL WHO
WANDER
ARE LOST

### *2. Key West's Retaliation*

**A. Plaintiffs engaged in protected petitioning.**

53. On May 7, 2026, Plaintiffs sued the City of Key West in this Court, alleging that the City violated Plaintiffs' First Amendment rights when it selectively enforced Key West's Historic District regulations against them because of the communicative content and viewpoint of their expression, as described above.

54. In support of their selective enforcement allegations, Plaintiffs alleged how the "non-compliance [of similarly situated properties] is as wide-ranging as it is well-known to the City; selective enforcement against rainbow pickets has been an ongoing topic of discussion, debate, and public comment at both City Commission and HARC meetings dating back to November 2025."

55. Plaintiffs illustrated that point with photographs of "a few of the non-white wooden fences and gates that, on information and belief, the City has evidently chosen not to cite, despite evidently also violating the HARC Guidelines," as well as examples of other exterior violations.

56. Plaintiffs identified 21 examples of apparently noncompliant fences, gates, and similar exterior features solely as comparator evidence supporting their allegation that the City enforced its regulations selectively based on content and viewpoint.

57. Plaintiffs did not ask the City to initiate enforcement against any of those properties and did not submit a code violation complaint concerning any of them.

**B. The City converted Plaintiffs' litigation evidence into code violation complaints attributed to Plaintiffs.**

58. Sometime on or before August 11, 2026, the City's legal counsel provided the City's Code Enforcement Department with the list of comparator properties described in Plaintiffs' suit and directed the Department to treat the federal litigation as if it were a code violation complaint reported by Ms. Sohn and Ms. Bagley-Sohn.

59. On August 11, the City's Code Enforcement Department opened 21 code violation cases in Plaintiffs' names.

60. For each opened case, City staff identified Plaintiffs as the complaining parties in the official case record, including through entries stating: "RECEIVED COMPLAINT FROM NICOLE SOHN AND LINDA -BAGLEY SOHN [sic] OF [Plaintiffs' address]" and "I received a complaint from Nicole Sohn & Linda Bagley- Sohn [Plaintiffs' address]." Those entries were false: neither Plaintiff had filed a code violation complaint concerning the property.

61. The same day, the City's Code Enforcement Director, Christopher Counsellor, referred the cases for investigation to other Code Enforcement staff by email, stating: "I received a complaint from Nicole Sohn & Linda Bagley- Sohn" followed by Plaintiffs' home address. One of those emails attached Plaintiffs' complaint from their lawsuit.

62. Upon information and belief, after receiving the new cases from Mr. Counsellor, code enforcement staff had concerns and questions about whether treating the properties described in Plaintiff's Complaint as a code violation complaint attributed to Ms. Sohn and Ms. Bagley-Sohn was appropriate or legal. The staff was advised that opening code enforcement cases in Ms. Sohn and Ms. Bagley-Sohn's names—as Mr. Counsellor directed—would violate Florida law.

63. The code violation notices that City staff delivered to the properties included a notation that the violation was "COMPLAINT DRIVEN"—i.e., the result of a citizen's code violation complaint (from Ms. Sohn and Ms. Bagley-Sohn), rather than from an investigation the City took of its own initiative.

64. On August 17, 2026, Ms. Sohn received a call from a neighbor whose property had been subjected to City code enforcement. The neighbor stated that City staff told her that the enforcement was because Ms. Sohn and Ms. Bagley-Sohn had complained of the neighbor's violation. Believing that Plaintiffs had filed a code violation complaint about her property, the neighbor was upset with Plaintiffs and confronted Ms. Sohn about it.

65. On August 18, Ms. Sohn went to Key West City Hall to investigate the City's actions. There, she met with Mr. Counsellor to determine why Plaintiffs had been identified as complainants.

66. Mr. Counsellor told Ms. Sohn, in effect, that "Legal" had given him a list of properties identified in Plaintiffs' suit and directed him to treat such identification as code violation complaints submitted by Plaintiffs. He further stated that the City's outside attorneys had likewise directed Plaintiffs' federal complaint be treated as a code violation complaint.

67. Mr. Counsellor confirmed that the City had initiated or was initiating enforcement concerning properties discussed in Plaintiffs' suit and was representing to affected property owners that Plaintiffs had filed a code violation complaint with the City.

### C. The City continues the false attribution after receiving notice that Plaintiffs never submitted code violation complaints.

68. Later on August 18, Plaintiffs' counsel sent the City a cease-and-desist letter, attached as **Exhibit A**, explaining that:

a. Plaintiffs had identified the comparator properties solely as evidence supporting their First Amendment selective enforcement claim;

b. neither Plaintiff had submitted a code violation complaint concerning any of those properties;

c. City records and communications were falsely identifying Plaintiffs as the persons who reported the properties;

d. at least one affected property owner had been led to believe that Plaintiffs personally reported her property; and

e. converting Plaintiffs' litigation evidence into code violation complaints attributed to Plaintiffs constituted retaliation for their protected petitioning activity.

69. Plaintiffs demanded that the City stop identifying them as complainants, correct or annotate the affected records, notify affected property owners of the false attribution, identify the persons responsible for the directive, and stop using their suit as purported code violation complaints submitted by Plaintiffs.

**70.** On August 21, the City rejected Plaintiffs' demand and expressly confirmed that it was treating their suit as code violation complaints submitted by Plaintiffs. The City stated: "The Plaintiffs then served the City with the Complaint putting it on notice of their complaints regarding the allegedly existing violations of the HARC Guidelines." The City's response is attached as **Exhibit B**.

71. The City further stated that it had "correctly identified the Plaintiffs as the source of the complaints" and that, "[g]iven that the City's code compliance is complaint driven, the City was obligated to act once the Plaintiffs provided their Complaint." The City did not cite any legal authority for its position.

72. The City conditioned cessation of the retaliatory enforcement on Plaintiffs' abandonment of factual allegations supporting their suit. Specifically, the City demanded that Plaintiffs confirm they no longer contended the comparator properties violated the HARC Guidelines, withdraw those allegations, and state that they did not want the City to enforce the HARC Guidelines. The City stated that otherwise it "intend[ed] to continue acting on the information provided to it by the Plaintiffs."

73. Thus, even after Plaintiffs notified the City that it was falsely stating that Plaintiffs

were complaining about their neighbors' properties and that they had never submitted code violation complaints, the City refused to correct the false attribution and threatened to continue it unless Plaintiffs withdrew evidence supporting their pending constitutional claim.

74. The code enforcement cases remain identified in City records as having been initiated by Plaintiffs, and the City has not notified the affected property owners that Plaintiffs did not submit the complaints.

75. The City's August 21 response conclusively establishes that it intends to continue to open code enforcement cases based on Plaintiffs' use of comparator evidence in their lawsuit and falsely inform Plaintiffs' neighbors that Plaintiffs are requesting the City do so unless Plaintiffs abandon factual allegations supporting their suit.

76. Discovery in Plaintiffs' suit is ongoing, and Plaintiffs expect to identify additional comparator evidence as the case progresses. Through its false attributions, the City has forced Plaintiffs into a retaliatory Hobson's choice: either prove their selective-enforcement claim, continue presenting comparator evidence and accept that the City will initiate enforcement against the identified property owners while blaming Plaintiffs; or refrain from presenting evidence necessary to support their constitutional selective enforcement claim.

77. The City's conduct has already prompted at least one neighbor to confront Plaintiffs and creates an ongoing risk of harm to Plaintiffs' relationships and reputation within their neighborhood. Many of the apparent violations Plaintiffs presented as comparator evidence have existed for years without issue. Key West residents value creative expression, including through painting their fences, gates, and houses. By falsely identifying Plaintiffs as code violation complainants, the City exposed them to anger, hostility, and damaged relationships with members of their community.

78. The City's conduct also burdens Plaintiffs' ability to identify and present additional comparator evidence as their suit proceeds.

79. The City's conduct would deter a person of ordinary firmness from filing or maintaining a civil rights action against the City, identifying comparator evidence in that action, or otherwise seeking judicial redress for the City's constitutional violations.

**D. Plaintiffs did not submit code violation complaints against the comparator properties.**

80. Plaintiffs filed their suit to obtain judicial relief from the City's selective enforcement against their property. They identified other properties solely as comparator evidence

supporting that constitutional claim.

81. The City identifies seven methods by which a person may report a municipal code violation on its website:

(1) "come to City Hall between 8:00 AM and 5:00 PM Monday through Friday";

(2) "file a complaint with the City";

(3) "call Code Enforcement";

(4) "e-mail a complaint";

(5) "submit a request through our See Click Fix app";

(6) "call (305) 809-3740 and leave a message"; or

(7) "call the Key West Police Department at (305) 809-1000."

*Code Enforcement*, https://www.cityofkeywest-fl.gov/273/Code-Enforcement.

82. Filing a federal lawsuit against the City in which comparator evidence is presented to support a First Amendment selective enforcement claim is *not* one of the City's designated methods of reporting a code violation.

83. Plaintiffs did not use any method to report the comparator properties identified in their suit because they did not request enforcement against those properties.

84. Florida law prohibits initiating enforcement proceedings by way of an anonymous complaint and requires a person who reports a potential code violation to provide the person's name and address before complaint-initiated enforcement may proceed. Fla. Stat. §§ 162.06(1)(b), 162.21(3)(b). Plaintiffs did not submit a report concerning the comparator properties or provide their names and address to the City for that purpose. (Indeed, the complaint in their suit does not provide Plaintiffs' address at all.)

85. Nothing in their suit represented that Plaintiffs were submitting municipal code violation complaints or requesting that the City initiate enforcement against their neighbors.

86. Plaintiffs' cease-and-desist letter further ensured the City knew that Plaintiffs were not complaining about their neighbors' properties or filing code enforcement complaints. The City nevertheless falsely designated Plaintiffs as complainants and refuse to correct this intentional falsehood.

87. Although the City could independently investigate information appearing in Plaintiffs' suit, Plaintiffs' identification of comparator properties as litigation evidence did not make Plaintiffs code violation complainants or provide a factual basis for representing that

Plaintiffs had affirmatively filed code violation complaints to Code Enforcement.

**E. The retaliatory conduct is attributable to the City.**

88. The challenged conduct resulted from an official directive transmitted by the City's legal counsel to Mr. Counsellor, the City official responsible for code enforcement.

89. Mr. Counsellor implemented that directive through official City records, departmental case assignments, investigations, notices, and communications with affected property owners.

90. After Plaintiffs notified the City that they had never submitted any code violation complaints, the City defended the decision to identify Plaintiffs as complainants and stated that it would continue acting on that decision unless Plaintiffs withdrew their allegations supporting their suit.

91. The directive, its implementation by Mr. Counsellor, and the City's knowing adoption and continuation of the conduct constituted an official City decision and caused, and continues to cause, the violation of Plaintiffs' First Amendment rights.

## CLAIMS FOR RELIEF

### COUNT ONE

**First Amendment Content and Viewpoint Discrimination**
***By All Plaintiffs***
**(42 U.S.C. § 1983)**

92. Plaintiffs reallege and incorporate by reference paragraphs 1–6 and 12–52.

93. The First Amendment prohibits government officials from targeting speech based on its communicative content. *Reed*, 576 U.S. at 163 (2015). Such "content-based laws" are presumptively unconstitutional. *Id.*

94. Viewpoint discrimination is an "egregious form of content discrimination" and is also "presumptively unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829–30 (1995).

95. Plaintiffs' rainbow picket display was expression subject to First Amendment protection.

96. The City selectively and arbitrarily enforced its Historic District regulations against Plaintiffs because of the communicative content and viewpoint of their rainbow display.

97. The City did not enforce its Historic District regulations against others similarly situated whose violations have different communicative content and viewpoint from Plaintiffs.

98. The City has no legitimate, content-neutral justification for selectively punishing Plaintiffs for their expression.

99. The City's selective and arbitrary enforcement was the result of an official policy, practice, or custom of the City, including a pattern of enforcement that was so persistent, widespread, or repetitious that the City's policymakers either knew or should have known of it.

100. The City's restrictions on Plaintiffs expression have caused, and will continue to cause, Plaintiffs irreparable harm, including chilling their constitutionally protected speech and expression.

101. The First Amendment categorically forbids the City's content- and viewpoint-based restrictions on Plaintiffs, and therefore the City's actions to enforce the Historic District regulations against Plaintiffs violated their rights under the First and Fourteenth Amendments.

**COUNT TWO**

**First Amendment Retaliation**
***By Plaintiffs Sohn and Bagley-Sohn***
**(42. U.S.C. § 1983)**

102. Plaintiffs reallege and incorporate by reference paragraphs 7–11, 12, 14–16, and 53–91.

103. The First Amendment generally "prohibits government officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech." *Houston Cmty. Coll. v. Wilson*, 595 U.S. 468, 474 (2022) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)).

104. Filing and maintaining their suit, seeking judicial redress for alleged constitutional violations, and presenting comparator evidence in support of that action are activities protected by the First Amendment. *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1288 (11th Cir. 2019).

105. Because Plaintiffs engaged in those protected activities, the City converted the comparator evidence they presented into code violation complaints attributed to Plaintiffs, initiated enforcement cases against Plaintiffs' neighbors in Plaintiffs' names, and falsely communicated or caused the false communication to affected property owners that Plaintiffs had complained about their properties.

106. After receiving actual notice that Plaintiffs had never submitted those code violation complaints, the City refused to correct the false attribution and stated that it would continue the challenged conduct unless Plaintiffs withdrew factual allegations supporting their suit.

107. The City's actions would likely deter a person of ordinary firmness from filing or maintaining a similar civil-rights action, presenting comparator evidence against the City, or otherwise seeking judicial redress.

108. The City's actions were substantially motivated by Plaintiffs' protected activity, as demonstrated by the City's use of Plaintiffs' suit itself as the asserted basis for the code cases and its demand that Plaintiffs withdraw allegations from their suit as the condition for stopping its false statements that Plaintiffs were filing code enforcement complaints against their neighbors.

109. The City's official directive, its implementation through its staff, and its knowing adoption and continuation of the conduct caused the deprivation of Plaintiffs' First Amendment rights.

110. As a direct and proximate result, Plaintiffs have suffered and continue to suffer reputational harm, damaged community and neighbor relationships, litigation-related burdens, and other compensable injuries.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court enter judgment in their favor and:

A. Declare the City's enforcement of the Historic District regulations against Plaintiffs' rainbow picket display to be unconstitutional in violation of the First Amendment;

B. Enjoin the City from taking any action to enforce the Historic District regulations against Plaintiffs for a rainbow picket display;

C. Award Plaintiffs no more than twenty dollars in nominal damages for their Count One claim;

D. Declare that the City violated Plaintiffs Sohn's and Bagley-Sohn's First Amendment rights by converting evidence presented in their suit into code violation complaints falsely attributed to Plaintiffs Sohn and Bagley-Sohn and by continuing that conduct unless Plaintiffs withdrew allegations supporting their suit;

E. Enjoin the City from identifying either Plaintiff Sohn or Bagley-Sohn as a complainant or reporting person concerning any property unless that Plaintiff actually submitted the code enforcement complaint;

F. Award Plaintiffs Sohn and Bagley-Sohn compensatory damages for their Count Two claim in an amount to be determined at trial;

G. Award Plaintiffs reasonable attorneys' fees and costs; and

H. Grant any other relief the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable with respect to their Count Two claim.

Respectfully submitted September 15, 2026,

*/s/ Samantha J. Past*
Samantha J. Past (FBN 1054519)
Nicholas L.V. Warren (FBN 1019018)
Michelle M. Morton (FBN 81975)
Daniel B. Tilley (FBN 102882)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-1769
nwarren@aclufl.org
spast@aclufl.org
mmorton@aclufl.org
dtilley@aclufl.org

Reid Levin (FBN 1038933)
**Reid Levin, PLLC**
P.O. Box 880682
Boca Raton, FL 33488
(561) 866-6089
reid@reidlevinpllc.com

Ashley N. Sybesma (FBN 22059)
Wayne LaRue Smith (FBN 31410)
**The Smith Law Firm**
509 Whitehead Street
Key West, FL 33040
(305) 296-0029
ashley@thesmithlawfirm.com
wsmith@thesmithlawfirm.com

*Counsel for Plaintiffs*

# **Exhibit A**

## **Plaintiffs' Cease-and-Desist Letter (Aug. 18, 2026)**

REID LEVIN, PLLC

August 18, 2026

**Via Email**

Hudson C. Gill, Esquire
W. Hampton Johnson IV, Esquire
Johnson, Anselmo, Murdoch, Burke, Piper & Hochman, P.A.
2455 East Sunrise Boulevard, Suite 1000
Ft. Lauderdale, FL 33304
Ph: 954-463-0100
hgill@jambg.com
whjohnson@jambg.com
mccarthy@jambg.com
Ostruemke@jambg.com

**Re: Cease-and-Desist and Demand to Correct False Attribution of Code Enforcement Complaints**

To Whom It May Concern:

We write as counsel to Nicole Sohn and Linda Bagley-Sohn, together with Bagley-Sohn Trust 04/23/2021 as Plaintiffs in the ongoing litigation *Nicole Sohn, et al. v. City of Key West*, in the U.S. District Court for the Southern District of Florida, Case No. 4:26-cv-10040. This Letter raises serious concerns regarding City's attribution of multiple Code Enforcement complaints to our clients even though neither client submitted, authorized, nor intended to submit any such complaint.

We have now learned that multiple Code Enforcement matters concerning properties identified in Plaintiffs' federal Complaint have been attributed to Nicole Sohn and Linda Bagley-Sohn as the complainants. Neither Nicole Sohn nor Linda Bagley-Sohn has ever submitted or authorized a Code Enforcement complaint concerning those properties. Nevertheless, their names and address have been associated with the resulting Code Enforcement matters, causing at least one affected property owner to believe that our clients personally reported her property to the City.

This morning, Nicole Sohn personally went to the City's Code Enforcement Department to determine how this occurred. According to Code Enforcement Director Chris Counsellor, the City Attorney's Office provided Code Enforcement with a packet containing the addresses identified in Plaintiffs' federal Complaint and instructed Code Enforcement to treat that material as a Code Enforcement complaint by Nicole Sohn and Linda Bagley-Sohn. Mr. Counsellor further

advised that the City's outside counsel likewise directed that the Complaint be treated as a Code Enforcement complaint.

On May 7, 2026, our clients filed a federal lawsuit asserting a constitutional claim under the First Amendment against the City for selectively enforcing its Historic District regulations. While their Complaint discusses some properties that are in apparent violation of the HARC Guidelines, these are references used only as evidence to demonstrate the City's selective enforcement as to their *own* property. ECF No. 1 at 4–9 ("While the City eagerly enforced its Historic District regulations against Plaintiffs' colorful protest, it has chosen *not* to cite noncompliant properties that express different messages.") The properties were identified for one purpose: to support Plaintiffs' allegation that the City selectively enforced its Historic District regulations. Identification of comparator properties as evidence in adversarial litigation against the City is not the submission of a Code Enforcement complaint against those property owners.

The City itself identifies the methods by which a person may report a Code violation. As the City's own Code Enforcement website[1] explains:

> There are several methods to report a violation. You can come to City Hall between 8:00 AM and 5:00 PM Monday through Friday. You can file a complaint with the City, call Code Enforcement, e-mail a complaint, or submit a request through our See Click Fix app. The office at City Hall is closed after 5:00 PM and on weekends and holidays. However, to report a possible code violation when the office is closed, call (305) 809-3740 and leave a message or call the Key West Police Department at (305) 809-1000.

Our clients employed none of those methods. Nor did they otherwise communicate an intent to report these properties for enforcement.

The distinction matters under Florida law. Section 162.06(1)(b) of the Florida Statutes provides that a person who reports a potential violation must provide his or her name and address to the local government before complaint-initiated enforcement may occur. *See also* Fla. Stat. § 162.21(3)(b). The City may, of course, independently investigate conditions that come to its attention and initiate enforcement based upon a Code inspector's own investigation where authorized by law. *See* Fla. Stat. §§ 162.06(1)(a), 162.21(3)(a). But nothing in those statutory provisions authorizes the City to convert evidence presented by adverse litigants into complaints purportedly made by those litigants, and then identify those litigants as the persons who reported the violations. The conduct described above therefore raises serious concerns under sections 162.06(1)(b) and 162.21(3)(b).

[1] https://www.cityofkeywest-fl.gov/273/Code-Enforcement.

The First Amendment concerns are equally serious. Plaintiffs' filing of their federal lawsuit and their use of comparator properties to support their constitutional claims are protected petitioning activity. *See Lozman v. City of Riviera Beach*, 585 U.S. 87 (2018). If, as Mr. Counsellor reported, City officials deliberately converted that litigation evidence into Code Enforcement complaints attributed to Plaintiffs, resulting in enforcement against their neighbors and causing those neighbors to believe Plaintiffs initiated the complaints, that conduct raises substantial concerns of retaliation for Plaintiffs' exercise of their First Amendment rights. *See Bennett v. Hendrix*, 423 F.3d 1247, 1254–55 (11th Cir. 2005).

The false attribution has also caused reputational harm to our clients and may give rise to additional state law claims, all of which are expressly reserved.

**Accordingly, we demand that the City immediately cease identifying Nicole Sohn or Linda Bagley-Sohn as complainants in any Code Enforcement matter unless either client has actually made or authorized such a complaint. We further demand that the City promptly:**

**(1) identify every Code Enforcement complaint, referral, investigation, Good Neighbor Courtesy Notice, Notice of Violation, citation, or other matter in which either client has been identified as a complainant or reporting person;**

**(2) correct or appropriately annotate each affected City record to make clear that neither client submitted or authorized the complaint, while preserving the original record as required by applicable public-records and retention law (*See* Fla. Admin. Code R. 1B-24.003);**

**(3) provide written corrective notice to each affected property owner who was informed, directly or through City records, that either client reported the property;**

**(4) identify the City personnel or agents who directed that Plaintiffs' federal Complaint be treated as Code Enforcement complaints and the basis for that direction; and**

**(5) cease any further use of Plaintiffs' federal Complaint as a purported citizen complaint submitted by Plaintiffs.**

The City and its counsel are further directed to preserve all documents and electronically stored information concerning these matters, including the packet provided to Code Enforcement, communications among the City Attorney's Office, outside counsel, City management, and Code Enforcement, Code Enforcement database entries and audit histories, complaint intake records, photographs, emails, text messages, SeeClickFix records, metadata, and any documents reflecting how or why Plaintiffs were identified as complainants. This preservation demand encompasses both existing records and associated metadata or audit information showing when entries were created, modified, or attributed to particular users.

Given the ongoing reputational harm and the possibility of additional enforcement activity, please confirm by **noon on Friday, August 21, 2026**, that the City has ceased further attribution

of complaints to our clients and advise what corrective action the City will take. Nothing in this letter waives any claim, remedy, argument, or request for relief available to Plaintiffs in the pending federal action or otherwise, all of which are expressly reserved.

Sincerely,

Nicholas L.V. Warren (FBN 1019018)
Samantha J. Past (FBN 1054519)
Michelle M. Morton (FBN 81975)
Daniel B. Tilley (FBN 102882)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-1769
nwarren@aclufl.org
spast@aclufl.org
mmorton@aclufl.org
dtilley@aclufl.org

Reid Levin (FBN 1038933)
**Reid Levin, PLLC**
P.O. Box 880682
Boca Raton, FL 33488
(561) 866-6089
reid@reidlevinpllc.com

Ashley N. Sybesma (FBN 22059)
Wayne LaRue Smith (FBN 31410)
**The Smith Law Firm**
509 Whitehead Street
Key West, FL 33040
(305) 296-0029
ashley@thesmithlawfirm.com
wsmith@thesmithlawfirm.com

# Exhibit B

## City's Response to Cease-and-Desist Letter (Aug. 21, 2026)

LAW OFFICES

**JOHNSON, ANSELMO, MURDOCH, BURKE, PIPER & HOCHMAN, P.A.**

A PROFESSIONAL ASSOCIATION

DAMIAN H. ALBERT, P.A.
SCOTT D. ALEXANDER, P.A.
SELENA A. GIBSON, P.A.
HUDSON C. GILL, P.A.
JEFFREY L. HOCHMAN, P.A.
E. BRUCE JOHNSON *
MELISSA L. JOHNSON, P.A

* BOARD CERTIFIED CIVIL TRIAL LAWYERS

2455 EAST SUNRISE BOULEVARD
SUITE 1000
FORT LAUDERDALE, FL 33304

(954) 463-0100 Broward

TELECOPIER (954) 463-2444

W. HAMPTON JOHNSON IV, P.A.
MICHAEL R. PIPER *
JONATHAN H. RAILEY, P.A.
CHRISTOPHER J. STEARNS, P.A.
NICHOLAS A. STEARNS
MARIELA E. TKACIK

RETIRED:
RONALD P. ANSELMO
ROBERT E. MURDOCH
MICHAEL T. BURKE

August 21, 2026

Reid Levin, Esq.
Reid Levin, PLLC
P.O. Box 880682
Boca Raton, FL 33488
(561) 866-6089
reid@reidlevinpllc.com
Via Email Only

**Re: The August 18, 2026, "Cease-and-Desist" Letter from Reid Levin, Esq.**

Mr. Levin:

Please allow this correspondence to serve as the response to your August 18, 2026, "Cease-and-Desist" letter, wherein you contend that the City of Key West ("City") improperly attributed "multiple Code Enforcement complaints to [y]our clients even though neither client submitted, authorized, nor intended to submit any such complaint."

Your contention regarding the lack of any complaint by your clients is incorrect. Nicole Sohn and Linda Bagley-Sohn ("Plaintiffs") filed a complaint ("Complaint") in federal court in which they identified approximately 20 properties ("Identified Properties") in the City's historic district that they believe are in violation of the City's Historic Architectural Guidelines ("Guidelines"). *See* ECF No. 1 at ¶¶ 44, 45, and 47. The Plaintiffs characterize the Identified Properties as being "out of compliance with" and "violating" the Guidelines. *Id.* at ¶¶ 37, 44. In the Complaint, they also complain that the City has not enforced the Guidelines against the Identified Properties. *Id.* at pgs. 4-9. The Plaintiffs then served the City with the Complaint putting it on notice of their complaints regarding the allegedly existing violations of the Guidelines.

Based on the information the Plaintiffs provided to the City, the City investigated the alleged violations, commenced code enforcement proceedings where appropriate, and correctly identified the Plaintiffs as the source of the complaints. Given that the City's code compliance is complaint driven, the City was obligated to act once the Plaintiffs provided their Complaint, which put the City on notice of alleged existing violations of the Guidelines.

If the Plaintiffs no longer contend that the Identified Properties violate the Guidelines and now wish to withdraw their complaints, please confirm in writing (1) that the Plaintiffs no longer

contend that the Identified Properties are in violation of the Guidelines, (2) that the Plaintiffs withdraw any assertion that the Identified Properties violate the Guidelines, and (3) that the Plaintiffs do not want the City to enforce the Guidelines against the Identified Properties. Otherwise, the City intends to continue acting on the information provided to it by the Plaintiffs.

Very truly yours,

Hudson C. Gill
For the Firm

CC: Nicholas L.V. Warren, Esq. (via email only)
Samantha J. Past, Esq. (via email only)
Michelle M. Morton, Esq. (via email only)
Daniel B. Tilley, Esq. (via email only)
Ashley N. Sybesma, Esq. (via email only)
Wayne LaRue Smith, Esq. (via email only)