UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 26-cv-10040-JEM

NICOLE SOHN, et al.,

Plaintiffs,

vs.

CITY OF KEY WEST,

Defendant.
_____________________________/

**DEFENDANT'S MOTION TO DISMISS AMENDED CONSOLIDATED COMPLAINT**

Defendant, CITY OF KEY WEST ("City"), by and through its undersigned counsel, requests entry of an order dismissing the Amended Consolidated Complaint (ECF No. 26) filed by the Plaintiffs, NICOLE SOHN ("Sohn"), LINDA BAGLEY-SOHN ("Bagley-Sohn") (collectively, "Homeowners"), and BAGLEY-SOHN TRUST 04/23/2021 ("Trust"), and in support states:

## I. Introduction

1. The Plaintiffs own a home in the City's Historic District. To protect the historic structures in the Historic District, the City has adopted design guidelines that restrict and regulate the types of changes that can be made to such historic structures. One such guideline is that wood picket fences typically must be painted white. After the Plaintiffs painted six pickets on their white fence in rainbow colors without prior approval – admittedly violating the City's regulations – the City issued a courtesy notice and then a notice of code violation advising the Plaintiffs that the change violated the design guidelines. The Plaintiffs subsequently brought the fence into compliance, and no fines or penalties were ever assessed against the Plaintiffs.

2. Based on the courtesy notice and notice of violation, the Plaintiffs filed the initial complaint in this litigation, asserting that the City was selectively enforcing the historic design guidelines. They identified approximately 21 other properties in the Historic District that they claimed violated the guidelines and complained that the City had not enforced those guidelines against them. The Plaintiffs identified the other properties by address and included photographs of

the alleged violations. Based on the information provided to the City by the Plaintiffs via their initial complaint, the City commenced code enforcement proceedings against the other properties and correctly identified the Homeowners as the individuals who complained against the other properties. When one of the neighbors complained to the Plaintiffs, the Plaintiffs' attorney sent a cease-and-desist letter to the attorney representing the City in this action. After the City refused to comply with their demands, the Homeowners filed a second lawsuit against the City asserting a First Amendment retaliation claim, which has been consolidated with this litigation.

3. Both the First Amendment selective enforcement claim and the First Amendment retaliation claim must be dismissed. As to the selective enforcement claim (Count I), the claim must be dismissed because the mere issuance of a courtesy notice and a notice of violation, without more, does not rise to the level of a First Amendment violation. As to the retaliation claim (Count II), the claim must be dismissed because (1) the Homeowners failed to allege a municipal policy or custom to establish a basis for municipal liability and (2) the alleged retaliatory actions are no more than *de minimis* inconveniences.

## II. Alleged Facts

4. The City is a Florida municipality. ECF No. 26 at ¶ 14.

5. The Homeowners, through the Trust, own a house in the City's Historic District. ECF No. 26 at ¶¶ 12, 13.

### The City's Historic Structures Architectural Regulations

6. As alleged in the Amended Consolidated Complaint, "[t]he City's Ordinance Code provides that, in general, structures (including fences) in the Historic District must comply with design guidelines promulgated by the City's Historic Architectural Review Commission (HARC)." ECF No. 26 at ¶ 18.

7. Both the City's Comprehensive Plan and Code of Ordinances prohibit, with respect to historic structures, the "[i]ntroduction of visible, audible, or atmospheric elements that are out of character with the property or significantly alter its setting." Key West, Fla. Code § 102-6(3); Key West, Fla. Comp. Plan Policy 5-1.9.2.

8. To implement these policies and regulations, the City created the HARC with the "authority to disapprove work which does not augment or preserve the character and appearance

of the historic districts" and "to approve work which is deemed to augment or preserve the character and appearance of the historic districts." KEY WEST, FLA. CODE §§ 90-126, -130, -139

9. The City also adopted the Historic Architectural Review Commission Design Guidelines ("HARC Guidelines"), which are "intended to preserve and protect the architectural environment and unique character of the historic neighborhoods of the Key West Historic District." KEY WEST, FLA. CODE § 90-142; KEY WEST, FLA. HARC ARCH. GUIDELINES, Introduction.

10. Per the HARC Guidelines, "changes to existing fences must be approved and permitted." KEY WEST, FLA. HARC ARCH. GUIDELINES at 35, 41; ECF No. 26 at ¶ 21 ("Erecting a new fence or changing an existing fence without HARC approval is a violation of the City's Land Development Regulations….").

11. "The traditional color for wood fences and gates is white." KEY WEST, FLA. HARC ARCH. GUIDELINES at 35, 41; ECF No. 26 at ¶ 19 ("The HARC Guidelines provide that white is the only appropriate color for wood fences and gates.").

12. Per section 102-94, "[n]o person shall cause alteration of any historic building unless such work has been authorized pursuant to the terms of article IV of [Chapter 102]."

**The City's Code Compliance**

13. Code compliance in the City is addressed in Article VI of the Code of Ordinances.

14. A code enforcement proceeding is initiated when the code enforcement officer, after identifying a potential code violation, provides notice to the alleged violator giving the person a reasonable time to correct the violation. KEY WEST, FLA. CODE § 2-637.

15. If the alleged violation is not corrected within the time specified for correction, the code enforcement officer may notify the special magistrate and request a hearing. KEY WEST, FLA. CODE § 2-637(2).

16. The code enforcement special magistrate has the same powers, duties and authority as stated in Chapter 162, Florida Statutes, including the authority to impose fines and liens. KEY WEST, FLA. CODE § 2-634(c).

17. The special magistrate also has the power to, among other things, take testimony under oath and issue orders having the force of law commanding whatever steps are necessary to bring a violation into compliance. KEY WEST, FLA. CODE §§ 2-635(3), (4).

18. If the special magistrate schedules a hearing, the special magistrate must "take testimony from the code enforcement officer and the alleged violator," and while the formal rules of evidence do not apply, "fundamental due process shall govern the proceedings." KEY WEST, FLA. CODE § 2-640.

19. At the conclusion of the hearing, the special magistrate must "issue findings of fact based on the evidence of the record and conclusions of law and [must] issue an order affording the proper relief consistent with powers granted in this division." KEY WEST, FLA. CODE § 2-641(1).

20. "The order may include a notice that it must be complied with by a specified date and that a fine may be imposed." KEY WEST, FLA. CODE § 2-641(1).

21. However, a fine may not be imposed until the alleged violator fails to comply with the date for compliance set by the special magistrate. KEY WEST, FLA. CODE § 2-643 ("The special magistrate, upon notification by the code enforcement officer that a previous order has not been complied with by the set time or upon finding that a repeat violation has been committed, may order the violator to pay a fine for each day the violation continues past the date set by the special magistrate for compliance.").

**The Plaintiffs Violate the HARC Guidelines**

22. In September 2025, the Plaintiffs "painted in rainbow colors six of the pickets on the white picket fence in front of their house along Fleming Street, and six of the pickets on the side of their house along Frances Street." ECF No. 26 at ¶ 26.

23. Based on the allegations in the Amended Consolidated Complaint, the Plaintiffs' conduct violated the HARC Guidelines because picket fences can only be painted white. ECF No. 26 at ¶ 19.

24. According to the Plaintiffs, their painting of the fence was a protest against the City Commission's vote "to accede to the state's demands" that "colorful marking and artwork on crosswalks and sidewalks," including rainbow crosswalks in the City, be removed. ECF No. 26 at ¶¶ 24, 25.

25. The Plaintiffs' painting of their fence prompted citizen complaints including on December 19, 2025, when "Penny Walker Pourciau emailed the City to complain that Plaintiffs' display violated the HARC Guidelines." ECF No. 26 at ¶¶ 28, 29.

26. On "December 20, 2025, a City code compliance officer left a 'Good Neighbor Courtesy Notice' on the Plaintiffs' fence gate, notifying them that the officer observed a code violation and requesting voluntary compliance." ECF No. 26 at ¶ 30.

27. "The Courtesy Notice stated: 'Please return picket fence to HARC approved color or contact HARC to apply for and obtain HARC approval for rainbow painted pickets.'" ECF No. 26 at ¶ 31.

28. The Plaintiffs claim that they twice sought HARC approval for their change to the picket fence, but the City never acted on the requests.[1] ECF No. 26 at ¶¶ 32, 36, 37.

29. On February 5, 2026, the Plaintiffs "received a 'Notice of Code Violation' from the City, notifying them that their property was in violation of the code because the rainbow-painted pickets did not comply with the HARC Guidelines and therefore required HARC review and approval, and further informing them that the investigation began with Ms. Walker Pourciau's email complaint." ECF No. 26 at ¶ 33.

30. "The Notice of Code Violation gave Plaintiffs 30 days to take corrective action or the matter would be referred for an administrative hearing." ECF No. 26 at ¶ 34.

31. "The Notice further provided that failure to correct the violation may result in a fine of up to $250 per day." ECF No. 26 at ¶ 35.

32. The Plaintiffs claim that "on March 25, 2026, the code compliance officer informed Ms. Sohn that if the display was not removed by the next day, Plaintiffs would incur a $250 fee." ECF No. 26 at ¶ 38.

33. The unidentified code compliance officer's statement – if accurate – would be a misstatement of the City Code. As explained above, per the City Code, a fine may not be imposed until (1) the special magistrate conducts a hearing, finds a violation, and sets a date for compliance, and (2) the violator fails to comply with the date for compliance set by the special magistrate. KEY WEST, FLA. CODE §§ 2-641(1), -643.

---

[1] The Plaintiffs' allegations are not correct. As will be demonstrated through discovery, while the Plaintiffs submitted two permit applications, they were advised through the City's eTRACKiT system that "[t]his proposed scope of work does not comply with the current HARC guidelines and requires HARC Commission review," meaning that a HARC application (not a permit application) was required. The Plaintiffs have never filed the required HARC application.

34. The Plaintiffs brought the Property into compliance before any fines were imposed. ECF No. 26 at ¶ 39.

**The Plaintiffs Sue the City Complaining that**
**It Is Unequally Enforcing the HARC Guidelines.**

35. The Plaintiffs then filed the Complaint commencing this litigation and complaining that the City was selectively enforcing the HARC Guidelines. *See* ECF No. 1.

36. In the Complaint, the Plaintiffs specifically identified approximately 21 properties in the City's historic district that they believed were in violation of the City's HARC Guidelines ("Other Properties"). *See* ECF No. 1 at ¶¶ 44, 45, and 47.

37. The Plaintiffs identified the Other Properties by address and included photographs of the alleged violations. *Id.*

38. The Plaintiffs described the Other Properties as being "out of compliance with" and "violating" the HARC Guidelines. *Id.* at ¶¶ 37, 44.

39. The Plaintiffs also complained that the City has not enforced the HARC Guidelines against the Other Properties. *Id.* at 4-9; *see id.* at 5, D ("The City's Failure to Enforce the Regulations Against Other Violations").

40. The Plaintiffs then served the City with the Complaint putting it on notice of their complaints regarding the allegedly existing violations of the HARC Guidelines.

**The City Takes Enforcement Action Against the Other Properties**

41. After receiving the Plaintiffs' Complaint identifying the alleged HARC Guideline violations at the Other Properties, the Code Enforcement Department opened code enforcement cases into the Other Properties. ECF No. 26 at ¶ 59.

42. In the Code Enforcement Department's tracking system, the data entries associated with the Other Properties' code enforcement proceedings stated: "RECEIVED COMPLAINT FROM NICOLE SOHN AND LINDA BAGLEY-SOHN…" and "I received a complaint from Nicole Sohn & Linda Bagley-Sohn…" ECF No. 26 at ¶ 60.

43. After one of the owners of the Other Properties "was upset with Plaintiffs and confronted Ms. Sohn about it," Sohn contacted the City and determined that the City had opened code enforcement proceedings against the Other Properties and identified the Homeowners as the "complainants." ECF No. at ¶¶ 65-67.

44. On August 18, 2026, the attorney for the Plaintiffs sent a cease-and-desist letter to the outside counsel representing the City in this litigation ("Cease-and-Desist Letter"). ECF No. 26 at ¶ 68; ECF No. 26 at 21-24.

45. The Plaintiffs' attorney explained that the Plaintiffs had apparently not actually wanted the City to equally enforce the HARC Guidelines. ECF No. 26 at 22.

46. The Plaintiffs' attorney demanded "that the City immediately cease identifying Nicole Sohn or Linda Bagley-Sohn as complainants in any Code Enforcement matter unless either client has actually made or authorized such a complaint." ECF No. 26 at 23.

47. The Plaintiffs' attorney further demanded that the City "promptly":

> (1) identify every Code Enforcement complaint, referral, investigation, Good Neighbor Courtesy Notice, Notice of Violation, citation, or other matter in which either client has been identified as a complainant or reporting person;
>
> (2) correct or appropriately annotate each affected City record to make clear that neither client submitted or authorized the complaint, while preserving the original record as required by applicable public-records and retention law (See Fla. Admin. Code R. 1B- 24.003);
>
> (3) provide written corrective notice to each affected property owner who was informed, directly or through City records, that either client reported the property;
>
> (4) identify the City personnel or agents who directed that Plaintiffs' federal Complaint be treated as Code Enforcement complaints and the basis for that direction; and
>
> (5) cease any further use of Plaintiffs' federal Complaint as a purported citizen complaint submitted by Plaintiffs.

ECF No. 26 at 23.

48. On August 21, 2026, the City's outside counsel responded to the Plaintiffs' attorney explaining (1) that the Homeowners had in fact submitted a complaint regarding code violations to the City when they served the City with the Complaint complaining about the City selective enforcing the HARC Guidelines and identifying the alleged violations by address and with photographs and (2) that "[g]iven that the City's code compliance is complaint driven, the City was obligated to act once the Plaintiffs provided their Complaint, which put the City on notice of alleged existing violations of the Guidelines." ECF No. 26 at 26.

49. The outside counsel also advised that "[i]f the Plaintiffs no longer contend that the [Other] Properties violate the Guidelines and now wish to withdraw their complaints" to confirm in writing "(1) that the Plaintiffs no longer contend that the Identified Properties are in violation of the Guidelines, (2) that the Plaintiffs withdraw any assertion that the Identified Properties violate the Guidelines, and (3) that the Plaintiffs do not want the City to enforce the Guidelines against the Identified Properties." ECF No. 26 at 26-27.

## III. Memorandum of Law

### A. The Selective Enforcement Claim

In Count I, the Plaintiffs assert a claim for "viewpoint discrimination" against the City under the First Amendment alleging selective enforcement. ECF No. 26 at ¶¶ 102-110. The fundamental flaw in the Plaintiffs' claim is that the issuance of a notice of violation without more does not rise to the level of a First Amendment violation. A "*de minimis* inconvenience in the exercise of First Amendment rights" does not amount to an adverse action under the First Amendment. *Bennett v. Hendrix*, 423 F.3d 1247, 1253 (11th Cir. 2005); *Bethel v. Town of Loxley*, 221 F. App'x 812, 813 (11th Cir. 2006) (holding that the plaintiffs "must show that the defendants' conduct resulted in something more than a 'de minimis inconvenience' to the exercise of their First Amendment rights.").

Courts have routinely held that the mere issuance of a notice of violation does not constitute a First Amendment violation. For example, in *Frankel v. Town of Bay Harbor Islands*, the plaintiff sued the Town under the First Amendment based upon its issuance of a notice of violation and courtesy notice for alleged code violations. No. 06-23109-CIV, 2007 WL 9709777, at *1-*2 (S.D. Fla. Apr. 16, 2007). This Court dismissed the complaint, finding that the issuance of the notices would not "likely deter a person of ordinary firmness from exercising her/his First Amendment rights." *Id.* at *3. It noted that the notice "did not impose a fine but rather, informed Plaintiff that a civil fine would result if violations respecting the maintenance of rain gutters and the removal of a dead tree stump were not corrected," and the subsequent courtesy notice "did not impose a fine but merely notified Plaintiff about the need to repair rain gutters damaged by hurricanes." *Id.* This Court concluded that "[e]ven if these [n]otices were sent in retaliation as Plaintiff contends, the Court does not find an actionable claim because a person of ordinary firmness, when faced with the Notices, would not be deterred from exercising her/his First Amendment rights." *Id.*; *see Volk*

*v. Heydt*, 1997 WL 27100 (E.D. Pa. 1997) (finding that a First Amendment claim based on notices of violation was unfounded because the plaintiffs did not allege that any enforcement proceedings were instituted, and concluding "the mere fact that the [city] sent these letters to the Plaintiffs without taking further action, is not sufficient to constitute an 'adverse action' for purposes of a claim for retaliation.").

This Court's reasoning from *Frankel* applies here. The City's issuance of the courtesy notice and the notice of violation did not impose any fines on the Plaintiffs. Rather, they merely advised the Plaintiffs of the existence of a potential code violation. Moreover, the City's Code provides that a fine could not be levied until (1) after the Plaintiffs had a hearing before the special magistrate, (2) after the special magistrate found a code violation and set a date for compliance, and (3) after the Plaintiffs failed to come into compliance by the date set by the special magistrate. Without more, the City's issuance of the courtesy notice and the notice of violation simply does not violate the First Amendment. Under *Frankel*, such conduct does not constitute an adverse action under the First Amendment, a necessary prerequisite to state a valid First Amendment claim regardless of the theory asserted.

The Plaintiffs previously cited *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998), and *Bee's Auto, Inc. v. City of Clermont*, 8 F. Supp. 3d 1369, 1378 (M.D. Fla. 2014), *aff'd*, No. 15-10212 (11th Cir. Sept. 3, 2015), to argue that their "self-censorship" in response to the notice "unequivocally constitutes an injury under the First Amendment." ECF No. 18 at 5-6.

The Plaintiffs' reliance on these cases was misplaced because they both addressed standing in the context of First Amendment challenges to the content of certain regulations. In *Wilson*, the plaintiffs – disbarred attorneys – brought suit claiming that two of the Rules and Regulations for the Organization and Government of the State Bar of Georgia, among others, "abridge[d] their First Amendment rights." 132 F.3d at 1424. The language cited by the Plaintiffs from *Wilson* addressed whether the disbarred attorneys had standing to challenge the regulations in a pre-enforcement context. *See id.* at 1428 ("When a plaintiff brings a pre-enforcement challenge to a sanctioning statute, regulation or ordinance, standing exists at the summary judgment stage when the plaintiff has submitted evidence indicating 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a

credible threat of prosecution.'") (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979)).

*Bee's Auto* involved a challenge to a municipal sign ordinance under the First Amendment. 8 F. Supp. 3d at 1371. After the city issued notices of violation and the plaintiff refused to comply, the parties agreed to stay all enforcement proceedings until the case was fully and finally resolved. *Id.* at 1377. After the defendant city raised standing, the court rejected the argument because (1) the city cannot agree to place the issue of the constitutionality of its code before the court while simultaneously arguing that the plaintiffs have no standing to litigate this issue and (2) a "plaintiff claiming a violation of the exercise of his constitutional rights need not show that he has been subject to actual prosecution or penalty in order to establish standing." *Id.* at 1378.

The claims in *Wilson* and *Bee's Auto* are fundamentally different from the First Amendment claim asserted in Count I. In both *Wilson* and *Bee's Auto*, the plaintiffs challenged the content of the subject regulations as being unconstitutional under the First Amendment. And the defendants attacked the claims on the standing grounds, arguing that the lack of enforcement prohibited the plaintiffs from challenging the content of the regulations. Here, the Plaintiffs are not alleging that the content of the City's HARC Guidelines violates the First Amendment. Instead, the Plaintiffs are arguing that the manner in which the City allegedly enforced those guidelines violated the First Amendment. As a result, the standing analysis from *Wilson* and *Bee's Auto* is simply inapplicable. The City is not arguing that the Plaintiffs lack standing to challenge some section of the City's regulations because it has not been enforced against them. Rather, the City asserts that, based on the type of First Amendment claim at issue – one based upon the manner in which a regulation is being enforced as opposed to merely its content – the Plaintiffs must identify some act by the City that rises to the level of a constitutional violation. Under *Frankel* and *Volk*, the courtesy notice and notice of violation simply do not rise to that level.

**B. The Retaliation Claim**

In Count II, the Homeowners assert a First Amendment retaliation claim based on two acts by either City staff or its outside counsel: (1) the Code Enforcement Director's decision (with advice from the City Attorney's office and outside counsel) to commence code enforcement proceedings against the Other Properties and identify the Homeowners as the source of the complaint that resulted in those code enforcement proceedings and (2) outside counsel's response

to the Cease-and-Desist Letter sent by the Plaintiffs' attorney. ECF No. 26 at ¶¶ 105, 106. The Homeowners' new allegations are insufficient to state a viable First Amendment retaliation claim because they do not allege a basis for municipal liability and the alleged actions do not rise to the level of an adverse action for purposes of stating a First Amendment retaliation claim.

**1. The Homeowners Failed to Allege Sufficient Facts Establishing a Basis for Municipal Liability.**

A municipality is not vicariously liable under § 1983 when its employees violate a person's constitutional rights. *See Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("But, under § 1983, local governments are only responsible for their own illegal acts. They are not vicariously liable under § 1983 for their employees' actions." (cleaned up)). Instead, "a municipality may be held liable for the actions of [its employees] only when a municipal 'official policy' causes a constitutional violation." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694-695 (1978)).

Thus, "to impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). A plaintiff can establish a custom or policy in three ways: "(1) identifying an official policy; (2) identifying an unofficial custom or widespread practice that is so permanent and well settled as to constitute a custom and usage with the force of law; or (3) identifying a municipal official with final policymaking authority whose decision violated the plaintiff's constitutional rights." *Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty.*, 48 F.4th 1222, 1229 (11th Cir. 2022).

These principles have long been recognized by courts within this District as a pleading requirement, and failure to properly allege a custom or policy routinely results in dismissal. *See, e.g., Vila v. Miami-Dade County*, No. 14-21346, 2014 WL 6976273, at *6 (S.D. Fla. Nov. 25, 2014); *Perez v. City of Miami*, No. 10-21179, 2011 WL 772858, at *4 (S.D. Fla. Feb. 28, 2011); *Andrade v. Miami-Dade County*, No. 09-23220, 2011 WL 4345665, at *8 (S.D. Fla. Sept. 16, 2011).

The Homeowners fail to allege sufficient facts establishing a basis for municipal liability

for the First Amendment retaliation claim. First, "[a] policy is a decision that is officially adopted by the municipality." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997). Here, the Homeowners fail to allege that any official policy adopted by the City Commission was the cause of the alleged constitutional violation. Nowhere in the Amended Consolidated Complaint do the Homeowners identify any official policy adopted by the City Commission. *See* ECF No. 26.

Second, the Homeowners also do not allege sufficient facts showing "an unofficial custom or widespread practice that is so permanent and well settled as to constitute a custom and usage with the force of law." *Chabad Chayil*, 48 F.4th at 1229; *see, e.g., N.R. by Ragan v. Sch. Bd. of Okaloosa Cnty.*, Fla., 418 F. Supp. 3d 957, 991 (N.D. Fla. 2019) ("Custom consists of 'persistent and widespread ... practices' or 'deeply embedded traditional ways of carrying out ... policy' that, although unwritten, are 'so permanent and well settled as to [have] ... the force of law.'" (citing *Monell*, 436 U.S. at 691 & n. 56)). Rather, they only rely upon the events involving themselves where (1) the City identified them as the source of information resulting in the code enforcement proceeding against the Other Properties and (2) the City's outside counsel refused to correct the alleged inaccuracy. *See* ECF No. 26 at ¶¶ 53-91.

This Court has repeatedly held that a plaintiff's allegation that she's been subjected to unconstitutional treatment on "several occasions" is not enough to establish a policy; instead, a plaintiff must show that the policy is "persistent or wide-spread" by alleging that *others* have been subjected to the same treatment. *Ross v. Correction Health Servs.-Jackson Health Servs.*, 2023 WL 2475443, at *4 (S.D. Fla. Mar. 13, 2023) (Altman, J.); *see also id.* ("[I]t probably goes without saying a 'custom' that affects just one of the hundreds of inmates at Metro West just isn't 'persistent or wide-spread.'" (cleaned up)); *Gurrera v. Palm Beach Cnty. Sheriff's Off.*, 657 F. App'x 886, 893 (11th Cir. 2016) ("Plaintiff fails to identify any examples beyond his own arrest of widespread unconstitutional conduct. Accordingly, Plaintiff's § 1983 claims against the Sheriff's Office fail to state a claim under *Monell*." (cleaned up)); *Jennings v. Stewart*, 461 F. Supp. 3d 1198, 1201 (N.D. Fla. 2020) (Winsor, J.) ("Other than his own experience, Jennings offers only a broad and conclusory assertion that frequent and customary actions like those set forth herein demonstrate a de facto policy." (quotation marks omitted)). The Homeowners' exclusive reliance on their own

experience thus is not sufficient to demonstrate the existence of a widespread unconstitutional policy.

Third, the Homeowners fail to identify a "municipal official with final policymaking authority whose decision violated [their] constitutional rights." *Chabad Chayil*, 48 F.4th at 1229. They base their First Amendment retaliation claim on a decision taken by the Code Enforcement Director – at the direction of the City Attorney's office and outside counsel – to open code enforcement cases against the neighboring properties and identify them as the source of the information and outside counsel's response to their Cease-and-Desist Letter.

However, the Homeowners failed to allege any facts establishing that the Code Enforcement Director, the City Attorney's Office, or outside counsel were final policymakers for the City. Certainly, a municipality may be liable "for a single illegal act committed by one of its officers .... when the challenged act may fairly be said to represent official policy, such as when that municipal officer possesses final policymaking authority over the relevant subject matter." *Scala v. City of Winter Park*, 116 F.3d 1396, 1397 (11th Cir. 1997) (alteration added). However, whether an official possesses "final policymaking authority is a question of state law." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Final policymakers must be "responsible for establishing final policy with respect to the subject matter in question" and must have taken "a deliberate choice to follow a course of action ... from among various alternatives[.]" *Id.* (alterations added).

In the City, the Charter provides that "all legislative powers of the city" are vested in the City Commission. KEY WEST, FLA., CHART. § 3.01(a). The Charter also provides that the City Manager has the duty to "[d]irect and supervise the administration of all departments, offices and agencies of the city." KEY WEST, FLA., CHART. § 4.04(b). The Charter provides no such power or duties to the Code Enforcement Director. Thus, nothing in the Charter indicates that the Code Enforcement Director is imbued with any final policymaking authority for the City.

Similarly, the City Attorney's authority is limited to acting as "legal advisor to, and attorney and counsel for" the City and "all of its officers, boards, commissions, agencies, authorities and subdivisions." KEY WEST, FLA., CHART. § 4.06. The Charter therefore does not provide that the City Attorney's office has final policymaking authority for the City. Rather, the City Attorney's office merely provides legal advice to the City and its officers.

Finally, the Homeowners' reliance upon an act of the City's outside counsel *in this litigation* has been rejected by the Eleventh Circuit as a basis for municipal liability. In *Viera v. City of Lake Worth*, a former city employee argued that the actions of the city's outside litigation counsel—who had filed a pleading containing the plaintiff's unredacted personal information—constituted a municipal policy or custom. 853 F. App'x 356, 358 (11th Cir. 2021). The District Court had ***dismissed the claim, with prejudice***, and the Eleventh Circuit affirmed. *See id.* ("We agree with the district court in all respects."). Most relevant here, the court held that city attorneys are not final policymakers under Florida law. *See id.* at 359-60. The court examined the city's charter, which vested all legislative power in the city commission and found "nothing in local or state law that tells us a city attorney is a policymaker." It noted that the plaintiffs "point[ed] to no caselaw suggesting such notion." *Id.* at 359. The plaintiffs in *Viera* also failed to plead how the city attorneys or private attorneys working for a private law firm that the City "merely hired," were state actors. *See id.* at 360. Thus, *Viera* establishes that the City's outside counsel (as well as the City Attorney's office) was not a final policymaker for the City. Because the outside counsel in this case was not a final policymaker, outside counsel's actions in litigation could not constitute a municipal policy that would render the City liable. For these reasons, the First Amendment retaliation claim must be dismissed.

**2. The Alleged Adverse Actions Identified in the Amended Consolidated Complaint Are at Most *De Minimis* Inconveniences.**

"To state a retaliation claim, ... a plaintiff must establish first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech." *Bennett,* 423 F.3d at 1250.

As to the second prong, "[a] plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Id.* at 1254. The "person of ordinary firmness" standard is objective, not subjective. *See id.* ("[W]e [do] not focus on the plaintiff's subjective, actual chilling."). While "the adverse effect 'need not be great,'" *Echols v. Lawton*, 913 F.3d 1313, 1323 (11th Cir. 2019) (quoting *Bennett*, 423 F.3d at 1254), "government officials should not be liable when the plaintiff is unreasonably weak-willed or suffers only a '*de minimis* inconvenience to her exercise of First

Amendment rights.'" *Bennett*, 423 F.3d at 1252 (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005)); *see Bethel*, 221 F. App'x at 813 (same).

Here, the Homeowners fail to allege any sufficient adverse actions for purposes of establishing a First Amendment retaliation claim. In the Amended Consolidated Complaint, they identify two allegedly retaliatory acts:

> [1] the City converted the comparator evidence they presented into code violation complaints attributed to Plaintiffs, initiated enforcement cases against Plaintiffs' neighbors in Plaintiffs' names, and falsely communicated or caused the false communication to affected property owners that Plaintiffs had complained about their properties.

ECF No. 26 at ¶ 105.

> [2] After receiving actual notice that Plaintiffs had never submitted those code violation complaints, the City refused to correct the false attribution and stated that it would continue the challenged conduct unless Plaintiffs withdrew factual allegations supporting their suit.

*Id*. at ¶ 106.

Neither act rises to the level of an adverse action for purposes of stating a First Amendment retaliation claim. As a threshold matter, the Homeowners' repeated assertion that the City "falsely communicated or caused the false communication to affected property owners that Plaintiffs had complained about their properties" is simply incorrect. It is entirely accurate that the Homeowners were the source of the complaints that resulted in the code enforcement proceedings against the Other Properties. Unquestionably, they complained to the City that it had not enforced the HARC regulations against the Other Properties, and their complaint resulted in the code enforcement proceeding against the Other Properties that they identified as allegedly violating the HARC Guidelines.

To wit, the Homeowners filed a complaint in this Court specifically identifying approximately 21 properties in the City's Historic District that they believed were in violation of the City's HARC Guidelines. *See* ECF No. 1 at ¶¶ 44, 45, and 47. The Homeowners identified the Other Properties by address and included photographs of the alleged violations. *Id.* They then characterized the Other Properties as being "out of compliance with" and "violating" the HARC Guidelines. *Id.* at ¶¶ 37, 44. The Homeowners also complained that the City has not enforced the

HARC Guidelines against the Other Properties. *Id.* at 4-9. The Homeowners then served the City with the Complaint putting it on notice of their complaints regarding the allegedly existing violations of the HARC Guidelines.

Once the Homeowners put the City on notice of the alleged violations, the City was forced to take action lest it be accused of continuing with the very conduct the Plaintiffs claimed violated the First Amendment. And in commencing the code enforcement proceedings, the City correctly identified the Homeowners as the source of the complaints given that it was the Homeowners who complained that the City was not equally enforcing the HARC Guidelines and provided the City with the addresses and photographs of the alleged violations. This information came from no other source. It is not an adverse action for the City to remedy a situation the Plaintiffs complained about and to identify the Plaintiffs as the reason the City was taking action.

Moreover, the act of opening code enforcement cases against the Other Properties and identifying the Homeowners as the source of the complaint is not an adverse action because it did not result in any action against the Homeowners. Rather, the only arguable adverse action (it is not) was directed at the Other Properties, which had code enforcement cases initiated against them. The City simply took no action against either Sohn or Bagley-Sohn when it opened code enforcement cases against the Other Properties.

Similarly, the City's response – through its outside counsel – to the Cease-and-Desist Letter sent by the Homeowners' attorney also does not rise to the level of an adverse action. An attorney's response to another attorney's demand in already pending litigation does not constitute retaliatory conduct. While the Plaintiffs may be unhappy that the response to their demand, it does not amount to anything more than a *de minimis* inconvenience. If it did, then any action taken by a governmental entity in pending litigation could be construed as First Amendment retaliation given that the filing of lawsuit is typically considered protected activity.

A review of cases addressing the sufficiency or insufficiency of conduct in terms of an adverse action in the First Amendment retaliation context confirms that the alleged retaliation here does not rise above a *de minimis* inconvenience. For example, in *Bennett,* the plaintiffs alleged "[1] the defendants took down license tag numbers of cars at a forum in support of the referendum, [2] surveilled the plaintiffs' homes and businesses, [3] set up roadblocks near their homes, [4] stopped their cars without reason and issued false traffic citations, [5] accessed government

databases to obtain confidential information on the plaintiffs, [6] attempted to obtain a warrant for their arrest on trumped-up environmental charges, and [7] mailed flyers to 35,000 homes in Forsyth County calling the plaintiffs the 'real criminals,' members of a 'chain gang,' and 'the same type of criminals that terrorize Forsyth County.' " *Id.* at 1249. There, the Eleventh Circuit noted that "[t]he alleged retaliatory acts complained of ... include a prolonged and organized campaign of harassment by local police officers," and that "the record is replete with instances where the defendants followed, pulled over, cited, intimidated, or otherwise harassed the plaintiffs." *Id.* at 1254. Given these allegations, the Eleventh Circuit concluded that the plaintiffs had sufficiently alleged a violation of their First Amendment rights by virtue of the defendants' retaliatory conduct. *Id.* at 1255–56. The City's actions fall well short of the conduct at issue in *Bennett* because the City took no action directed at the Homeowners.

Two Sixth Circuit decisions confirm that the actions at issue here do not constitute First Amendment violations. In *Mattox v. City of Forest Park*, the Sixth Circuit found that the two plaintiffs in that case, who asserted First Amendment retaliation claims based upon the issuance of an investigative report about the fire department, had not pleaded sufficient injury to make out a claim for First Amendment retaliation. 183 F.3d 515 (6th Cir. 1999). One of the plaintiffs was a public official, but the other plaintiff (Holly) was not. *Id.* at 522. The Sixth Circuit found that Holly had not pleaded sufficient injury to support a First Amendment retaliation claim. It found that Holly had not "allege[d] concrete injuries suffered by Holly as a result of" the revelations in the report. *Id.* at 532. The court explained that she

> offers only generalized statements about the effect on her character and reputation, about being held up to 'ridicule, contempt, shame, and disgrace,' and about the effect on her respectability, comfort, and position in society. Nowhere does she attempt to concretize her personal injury. Without anything more specific, we cannot say that this meets the constitutional threshold required for her claim of First Amendment retaliation to proceed.

*Id.* at 523. Thus, Holly failed to allege an "adverse action" sufficient to sustain a claim of First Amendment retaliation. *Id.*

In *Wurzelbacher v. Jones-Kelley*, the Sixth Circuit found that a citizen's allegations were insufficient to state a First Amendment retaliation claim. 675 F.3d 580, 584 (6th Cir. 2012). It found the adverse action pleaded by the plaintiff was insufficient to create a cause of action, where

the citizen alleged “that defendants, without his knowledge, performed several improper database searches under his name.” *Id.* at 584. The plaintiff alleged “that his knowledge of the improper database searches caused him to suffer ‘emotional distress,’ harassment, personal humiliation, and embarrassment.” *Id.* The Sixth Circuit found such allegations “too generalized.” *Id.* It found that the adverse action at issue was too inconsequential to state a First Amendment retaliation claim. Thus, a “person of ordinary firmness” would not be deterred or chilled by the alleged action in that case. *Id.* Under the reasoning in *Mattox* and *Wurzelbacher*, the City’s conduct does not constitute an adverse action under the First Amendment.

The Homeowners’ assertion that the City’s actions may have violated state law (they did not) does not alter the analysis. Courts have held that the fact that conduct may have violated state law or city ordinance does not make the conduct so adverse as to give rise to a First Amendment retaliation claim. *Spencer v. City of Hendersonville*, 487 F. Supp. 3d 661, 689 (M.D. Tenn. 2020), *aff'd sub nom. Spencer v. City of Hendersonville, TN*, No. 20-6168, 2021 WL 8016828 (6th Cir. Oct. 8, 2021).

In the end, nothing the City did constitutes anything more than *de minimis* inconvenience for purposes of a First Amendment retaliation claim. Upon receiving notice via the Homeowners that the Other Properties may be in violation of the HARC Guidelines, the City commenced code enforcement proceedings against those properties and correctly identified the Homeowners as the source of the complaints that resulted in those proceedings. Such conduct simply does not violate the First Amendment.

**WHEREFORE**, Defendant, CITY OF KEY WEST, requests entry of an order dismissing the Amended Consolidated Complaint (ECF No. 26) filed by the Plaintiffs, NICOLE SOHN, LINDA BAGLEY-SOHN, and BAGLEY-SOHN TRUST 04/23/2021, together with such additional relief the Court deems just and proper.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 2nd day of October 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of records or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

JOHNSON, ANSELMO, MURDOCH, BURKE,
PIPER & HOCHMAN, P.A.
*Counsel for Defendant City of Key West*
2455 East Sunrise Boulevard, Ste. 1000
Fort Lauderdale, FL 33304
Telephone: 954-463-0100

BY*: /s/Hudson C. Gill*
Hudson C. Gill
Florida Bar No. 15274
W. Hampton Johnson, IV
Florida Bar No. 98607

**SERVICE LIST**

Nicholas L.V. Warren
ACLU Foundation of Florida
4343 West Flagler Street, Suite 400
Miami, FL 33134
*Counsel for Plaintiff*

Nicholas L.V. Warren, Esq.
Samantha J. Past, Esq.
Michelle M. Morton, Esq.
Daniel B. Tilley, Esq.
ACLU Foundation of Florida
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-1769
nwarren@aclufl.org
spast@aclufl.org
mmorton@aclufl.org
dtilley@aclufl.org
*Counsel for Plaintiff*

Reid Levin, Esq.
Reid Levin, PLLC
P.O. Box 880682
Boca Raton, FL 33488
(561) 866-6089
reid@reidlevinpllc.com
*Counsel for Plaintiff*

Ashley N. Sybesma, Esq.
Wayne LaRue Smith, Esq.
The Smith Law Firm
509 Whitehead Street
Key West, FL 33040
(305) 296-0029
ashley@thesmithlawfirm.com
wsmith@thesmithlawfirm.com
*Counsel for Plaintiff*

Hudson C. Gill, Esq.
hgill@jambg.com
cardona@jambg.com
ostreumke@jambg.com
W. Hampton Johnson, IV, Esq.
whjohnson@jambg.com
mccarthy@jambg.com
Johnson, Anselmo, Murdoch, Burke,
Piper & Hochman, P.A.
2455 East Sunrise Boulevard, Ste. 1000
Ft. Lauderdale, FL 33304
954-463-0100
*Counsel for Defendant*